IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

**BETTY GOSELAND**                                                                                        **PLAINTIFF**

VS.                    Civil No. 2:18-cv-02108-PKH-MEF

**NANCY A. BERRYHILL,**
**Acting Commissioner,**
**Social Security Administration**                                              **DEFENDANT**

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

#### I. Procedural Background

Plaintiff filed her application for disability insurance benefits ("DIB") on February 9, 2015, due to facial numbness which caused headaches and nausea, restroom issues, memory loss, fatigue, two bulging discs in her lower back, and severe degenerative bones. (ECF No. 13, pp. 14, 197). Plaintiff alleged an onset date of November 28, 2014. (*Id*., p. 194). Her claim was denied initially on October 26, 2015, and upon reconsideration on January 14, 2016. (*Id*., pp. 14, 112-14, 116-17). An administrative hearing was held on August 24, 2016, in Fort Smith, Arkansas, before the Hon. Glenn A. Neel, Administrative Law Judge ("ALJ"). (*Id*., pp. 35-78). Plaintiff was present and represented by counsel, Susan Brockett, at the hearing. (*Id*.). Jim Spragins, a vocational expert, also testified at the hearing. (*Id*.).

By written decision dated September 20, 2017, the ALJ found Plaintiff's lumbago, peripheral neuropathy, headaches, obesity, history of double mastectomy and chemotherapy, major depressive disorder/unspecified depressive disorder, and unspecified anxiety disorder to be severe, but that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments. (*Id*., pp. 16-17). The ALJ found that Plaintiff

retained the residual functional capacity ("RFC") to:

> [P]erform light work as defined in 20 CFR 404.1567(b) except she can occasionally climb ramps and stairs, she can never climb ladders, ropes or scaffolds, she can occasionally balance, stoop, kneel, crouch and crawl, she can frequently handle and finger bilaterally, and she must avoid concentrated exposure to hazards including no driving as part of work. She is able to perform work where interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote, with few variables and little use of judgment, and the supervision required is simple, direct and concrete.
> (*Id*., pp. 19-25).

With the assistance of a vocational expert ("VE"), the ALJ then determined Plaintiff would be unable to perform any past relevant work. (*Id*., p. 25); however, the ALJ found Plaintiff could perform the requirements of the representative occupations of: Price Marker (DOT No. 209.587-034), 496,000 jobs in the national economy; Housekeeping Cleaner (DOT No. 323.687-014), with 231,000 jobs in the national economy; or, Routing Clerk (DOT No. 222.587-038), with 76,000 jobs in the national economy. (*Id*., p. 26). The ALJ found Plaintiff had not been disabled under the definition of the Act from November 28, 2014, through the date of his decision. (*Id*., p. 27).

On May 16, 2018, the Appeals Council denied Plaintiff's request for review. (*Id*., pp. 5-9). Plaintiff then filed this action on June 25, 2018. (ECF No. 1). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs. (ECF Nos. 16, 17). The case is ready for decision.

## II. Relevant Evidence

The undersigned has conducted a thorough review of the entire record in this case. The complete sets of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

At the administrative hearing held on August 24, 2016, Plaintiff testified that she lived

with her husband, son and daughter-in-law. (ECF No. 13, pp. 38, 41). She testified that her son and daughter-in-law had moved in with her and her husband for some time after her husband had a stroke, and she had to ask them to move back in again as her condition worsened. (*Id*.). Plaintiff testified she did not take much time off work at first after receiving her breast cancer diagnosis. (*Id*., p. 50). She took two weeks off after her double mastectomy and continued working for about three months after starting chemotherapy. (*Id*.). She related that after she started chemotherapy, she began making serious errors at work, was having problems with vomiting and then sinus infections, and she no longer felt able to do her job. (*Id*., pp. 50-52). Plaintiff testified that she had neuropathy in her hands and legs, for which she was being treated for with Lyrica. (*Id*., pp. 53-56). Her neuropathy caused her to lose her balance, led to her cutting herself and not noticing for extended periods of time, as well as pain in her feet. (*Id*.). She explained that the neuropathy in her hands was constant, but she had been told that she needed to keep using her hands, so she tried using colored pencils and could not hold them for more than five minutes at a time. (*Id*., pp. 63-64). Plaintiff also said she was unable to use the mouse on a computer for very long due to her neuropathy. (*Id*.). Plaintiff testified that despite having operations to repair her nose, she continued to have headaches as well as constant nausea. (*Id*., p. 59).

    Medical evidence of record shows:

    On June 3, 2014, Plaintiff underwent a routine mammogram which revealed a small nodule in her right breast. (*Id*., p. 323). The next day an ultrasound and a biopsy were taken. (*Id*. pp. 321-22).

    Plaintiff was seen at the Arkansas Surgical Group for a post-mastectomy follow up on September 8, 2014. She reported beginning chemotherapy on August 28, 2014, having mild

nausea but tolerating it well.  (*Id*., p. 298).

On April 7, 2015, Plaintiff was seen by Dr. Varant Arzoumanian for stage I grade 3 triple negative breast cancer.  (*Id*., p. 334-38).  Plaintiff reported fatigue, night sweats, decreased appetite, sleep disturbances, insomnia, back pain, dry skin, dizziness, frequent and severe headaches, and easy bruising.  (*Id*.).  Dr. Arozoumanian provided the diagnoses of: primary malignant neoplasm of female breast, no recurrence; nausea and vomiting - not completely well controlled; leukopenia; neuropathy; hypomagnesemia; hypokalemia; numbness of face; abnormal weight loss; and, depressive disorder.  (*Id*.).  Plaintiff was seen again on April 21, 2015 with similar findings.  (*Id*., pp. 330-34).

On September 15, 2015, Plaintiff was seen by Kristen Eckelhoff, Psy.D., for a Mental Diagnostic Evaluation.  (*Id.*, pp. 430-33).  Plaintiff reported headaches, facial numbness, nausea, memory loss, last of brain function, fatigue, bulging disc in lower back, and degenerative bones.  (*Id*., p. 430).  She related that she had never been hospitalized for psychiatric reasons, nor was she then in any kind of mental health treatment, but she had seen an outpatient therapist in the past and found it to be helpful.  (*Id*.).  Plaintiff reported she had a C or D average in school and had always had difficulty with concentration and focus.  (*Id*.).  Plaintiff assumed she had ADHD, but she had never been tested or treated for it.  She dropped out of school after the ninth grade and later attained a GED in 1999.  (*Id*.).  Plaintiff said she began making mistakes at her job after beginning chemotherapy for breast cancer the previous year.  (*Id*.).  Dr. Eckelhoff provided the diagnoses of an unspecified anxiety disorder and an unspecified depressive disorder.  (*Id*., p. 432).  Regarding Plaintiff's day-to-day adaptive functioning, Dr. Eckelhoff opined that Plaintiff was able to complete all activities of daily living (ADL's) without assistance; that she has vast experience with handling money and has no difficulties with financial matters; that she is able to

drive and go to the store alone; she has lunch with friends monthly; and, she manages medications for both herself and her husband. (*Id.*). Dr. Eckelhoff found no indication that Plaintiff had difficulties communicating and interacting in a socially adequate manner, and she was able to communicate in an intelligible manner. (*Id.*). Plaintiff would likely be effective in sustaining persistence in completing tasks. (*Id.*). Dr. Eckelhoff opined that Plaintiff would likely have difficulties with concentration, lack of focus, and memory problems if she pursued skilled work, and this may cause her to be less productive at certain types of skilled jobs. (*Id.*, pp. 432-33).

On December 21, 2015, Plaintiff saw Brandi Guthrey, M.D. for depression and headaches. (*Id.*, pp. 525-28). Plaintiff reported taking 2-3 Lortab per day for pain - headache mostly. (*Id.*, p. 527). Dr. Guthrey started Plaintiff on a trial of Fioricet and informed her that she needed to wean off of Lortab as it was likely contributing to the majority of her headaches. (*Id.*, p. 528).

On February 9, 2016, Plaintiff was seen by Humdum Pasha Durrani, M.D. for consultation regarding her history of breast cancer. (*Id.*, pp. 452-55). Dr. Durrani referred Plaintiff to a neurologist for evaluation of her neuropathy and migraine problems. (*Id.*, p. 455).

On February 16, 2016, Plaintiff went to William A. Knubley, M.D. for evaluation of her headaches and facial numbness. (*Id.*, pp. 473-79). Plaintiff reported experiencing chemotherapy related neuropathy, but also memory problems, ringing in her ears, chronic nausea, headaches, and facial numbness all in the past year or so. (*Id.*, p. 473). Plaintiff reported she did not have a history of migraines, but she developed progressive headaches that became daily headaches over the past year. (*Id*). Plaintiff reported taking half a Lortab and one Fiorcet twice daily for those headaches, which relieved them slightly. (*Id.*). She reported occasional visual changes, but

never any obvious chronic migraines with light and noise intolerance or nausea and vomiting. (*Id*.). On neurological exam, Plaintiff's cranial nerves were intact, motor skills were normal, she had reduced light touch sensation, and a normal gait. (*Id*.). Dr. Knubley diagnosed Plaintiff with: peripheral neuropathy associated with discomfort, likely chemotherapy induced; persistent daily headache without typical migraine features or migrainous history, and he noted Bruxism or TMJ myofascial symptoms associated with medication overuse/rebound phenomena may be contributing to this problem; subjective facial numbness without obvious trigeminal neuropathy; persistent tinnitus possibly due to bruxism rather than chemotherapy, also medication induced effects may be a fault; possible hypertension contributing to some symptoms; and, persistent depression and anxiety related to her medical issues that he opined may contribute to some of her problems. (*Id*., p. 479).

On March 7, 2016, Plaintiff was seen by Dr. Guthrey for follow up. (*Id*., pp. 511-13). Dr. Guthrey gave Plaintiff samples of Lyrica and asked her to wean herself off Fioricet and Lorcet. (*Id*., p. 513).

Dr. Guthrey filled out a physical medical source statement form on March 9, 2016. (*Id*., pp. 507-08). Dr. Guthrey listed Plaintiff's diagnoses as neuropathy and breast cancer. (*Id*.). Dr. Guthrey checked several restrictions, including: Plaintiff was likely to be absent four or more days per month; she would need to recline or lie down in excess of typical breaks during an 8-hour work day; she would require a sit/stand/walk option at will if employed; she could never crawl, climb, stoop, crouch or kneel; she could not use repetitive foot controls; she could never lift or carry more than 10 pounds; and, she could not use either hand for reaching, simple grasping, pushing and pulling, and fine manipulation. (*Id*.). Dr. Guthrey did not, however, indicate whether Plaintiff's condition prevented her from working the past 12 months or was

reasonably expected to last the next 12 months, and she did not include any remarks or point to any medical evidence to support her opinions. (*Id*.).

By referral from Dr. Knubley, Plaintiff went to Jacob K. Joseph, M.D. at Cooper Clinic Gastroenterology on April 5, 2016 for evaluation of her nausea. (*Id*., pp. 546-47). Plaintiff reported daily nausea, early satiety, vomiting two to three times a month, and lower abdominal cramps. (*Id*.). Dr. Joseph diagnosed Plaintiff with chronic nausea and sent her for an upper endoscopy with plans to obtain a gastric emptying study if the endoscopy was inconclusive. (*Id*.).

Dr. Joseph performed an upper endoscopy on Plaintiff on April 12, 2016. (*Id*., p. 561). Dr. Joseph diagnosed Plaintiff with erosive esophagitis, hiatal hernia, gastritis/duodenitis, and status post small bowel biopsies to exclude sprue. (*Id*.). Dr. Joseph recommended gastroesophageal reflux disease precautions and placed her on a daily proton pump inhibitor with Protonix 40 mg. (*Id*.).

A master treatment plan was developed for Plaintiff on April 29, 2016 at Valley Behavioral Health. (*Id*., pp. 492-495). Plaintiff was diagnosed with major depressive order, single episode, severe without psychotic features, and with anxiety disorder, unspecified. (*Id*.). Plaintiff's treatment plan included 2-3 individual therapy sessions per month, a pharmacological management meeting, and she was advised to take all medications as prescribed. (*Id*.).

On May 9, 2016, Plaintiff returned to Dr. Durrani with complaints of pain in her chest and nodularities at the site of her mastectomy. (*Id*., pp. 459-62). Dr. Durrani planned to check tumor markers and consider a PET scan. (*Id*.).

On May 19, 2016, Plaintiff saw Dr. Knubley again to follow up and to assess the effectiveness of Lyrica. (*Id*., pp. 480-82). Plaintiff reported the Lyrica helped for about two

weeks but then dropped off. Dr. Knubley planned to increase her Lyrica dose, but advised Plaintiff to use it only up to two days per week as more frequent use may irritate her headaches. Smoking cessation was also recommended. (*Id*.). Dr. Knubley described Plaintiff's headaches as likely multifactorial, contributed to by tobacco use, nasal congestion, TMJ myofascial problem, and medication overuse. (*Id*.).

Plaintiff saw Dr. Guthrey on June 7, 2016 for snoring and neuropathy. (*Id*., pp. 521-23). Dr. Guthrey noted if Plaintiff's snoring did not improve with correction of her deviated septum, they would do a sleep study to evaluate Plaintiff for obstructive sleep apnea. She was also advised to continue to wean from hydrocodone. (*Id*.).

On June 15, 2016, Plaintiff saw Amy E. Stinson, D.O. at Cooper Clinic's Department of Ear, Nose & Throat for evaluation of tinnitus, sinus problems, and pain in the right side of her nose into her sinuses. (*Id.*, pp. 543-44). Dr. Stinson diagnosed Plaintiff with tinnitus, a deviated septum, chronic sinusitis, and turbinate hypertrophy. (*Id*.). Plaintiff reported she was considering getting hearing aids, not for hearing loss, but to attempt to mask the sound of her tinnitus. (*Id*). Dr. Stinson noted a long conversation with Plaintiff regarding her treatment options, and that while Plaintiff had definite findings on physical exam and her CT, Dr. Stinson was unsure whether removing the obstruction in Plaintiff's sinuses would alleviate her pain. (*Id*., p. 544). Dr. Stinson informed Plaintiff that the pain may be neuropathic pain from her chemotherapy, and an operation may or may not change that pain. (*Id*.). Plaintiff expressed an understanding and agreed to go forward with the operation. (*Id*.).

Plaintiff returned to Dr. Stinson for a three-week post-operative follow up on August 12, 2016. (*Id*., p. 536). Plaintiff reported she was feeling better overall but was still having some problems with irritation in her nose. (*Id*.). Plaintiff also reported she was breathing better, was

having less drainage, and felt she was starting to heal. (*Id*.). Dr. Stinson performed a sinus endoscopy and found Plaintiff was healing well and advised her to continue with moisture in her nose. (*Id*.).

On August 11, 2016, Plaintiff saw Jason Johnson, Au.D. CCC-A, for a comprehensive audiologic assessment. (*Id*., p. 550). Dr. Johnson found Plaintiff had hearing within the normal range at 250-4000 Hz, but mild to moderate high frequency sensorineural hearing loss at 6-8 Hz in both ears. (*Id*.). Dr. Johnson noted high frequency hearing loss and tinnitus are often a side effect of chemotherapy, but it was possible Plaintiff's TMJ could be contributing to her tinnitus. (*Id*.). Dr. Johnson recommended bilateral amplification with tinnitus therapy when Plaintiff was ready. (*Id*.).

Plaintiff went to Ahmad Al-Khatib, M.D. for a consultative neurological evaluation on December 16, 2016. (*Id*., pp. 583-87). An examination showed normal results, except for tenderness over the lumbosacral spinal region, diminished pinprick and light sensation in both feet, and a cautious antalgic gait. (*Id*., pp. 583-84). Dr. Al-Khatib also performed nerve conduction studies in Plaintiff's bilateral upper and lower extremities and found no abnormalities. (*Id*., pp. 585-87). Dr. Al-Khatib offered the following impressions: likely small fiber pure sensory peripheral neuropathy, possibly induced by chemotherapy; chronic low back pain; consider reviewing MRI of lumbosacral spine to evaluate for lumbosacral spinal disease; and, gait dysfunction secondary to the above. (*Id*., p. 584). Based on his findings and impressions, Dr. Al-Khatib opined that Plaintiff had "mild limitations in standing, walking, and carrying objects." (*Id*.).

Dr. Al-Khatib also completed a medical source statement. (Id., pp. 588-93). He indicated that Plaintiff could never lift or carry more than twenty pounds; could sit two hours at a

9

time, but not more than four hours in an eight hour workday; could reach, handle, finger, and feel frequently bilaterally; could only occasionally push or pull bilaterally; could frequently use foot controls bilaterally; could never climb stairs, ramps, ladders, or scaffolds; and, she could never be exposed to unprotected heights or moving mechanical parts. (*Id.*). Dr. Al-Khatib did not identify any clinical findings to support his assessments of Plaintiff's limitations. (*Id.*).

### III. Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. 20 C.F.R. § 404.1520(a)(4). Only if she reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity. *McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 404.1520(a)(4)(v).

### IV. Discussion

Plaintiff raises the following issues on appeal: (1) whether the ALJ erred in developing the evidence; (2) whether the ALJ properly considered Plaintiff's subjective complaints; and, (3) whether substantial evidence supports the ALJ's physical RFC determination. (ECF No. 16, pp. 9-16).

### A. Development of the Record

Plaintiff argues the ALJ did not address the difficulties consultative examiner, Dr. Eckelhoff, noted Plaintiff might face in a competitive environment; specifically, Dr. Eckelhoff's findings that Plaintiff appeared to struggle with forwards/backwards sequencing tasks, and that

she would likely have difficulty with concentration, focus, and memory problems at certain types of skilled jobs. (ECF No. 16, p. 10). The Agency contends there was sufficient evidence in the record, and that opinions regarding Plaintiff's ability to work are not medical opinions and do not deserve special significance because they invade the province of Commissioner to make the ultimate disability determination. (ECF No. 17, p. 5).

The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed one based on sufficient facts. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). The ALJ is not, however, required to function as the claimant's substitute counsel, but only to develop a reasonably complete record. *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994)). While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

The need for medical evidence does not necessarily require the Commissioner to produce additional evidence not already within the record. An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision. *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001). Providing specific medical evidence to support his disability claim is, of course, the Plaintiff's responsibility, and that burden of proof remains on him at all times to prove up his disability and present the strongest case possible. *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991); 20 C.F.R. § 404.1512(a).

There is no requirement that an ALJ must obtain an RFC assessment from each treating

or examining physician. The Eighth Circuit Court of Appeals has upheld the Commissioner's RFC assessment in cases where the ALJ did not rely on a treating physician's functional assessment of the claimant's abilities and limitations. *See e.g., Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007) (the medical evidence, state agency physician opinions, and claimant's own testimony were sufficient to determine RFC); *Stormo v. Barnhart*, 377 F.3d at 807-08 (medical evidence, state agency physicians' assessments, and claimant's reported activities of daily living supported the RFC); and, *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir. 2004) (ALJ properly relied upon assessments of consultative physicians and a medical expert).

The ALJ was not required to request a medical source statement further clarifying Dr. Eckelhoff's opinion regarding Plaintiff's mental abilities. In her checkbox form assessment, Dr. Eckelhoff noted Plaintiff struggled with the forwards/backwards sequencing task, but she was able to get two out of three words correct after five minutes. (ECF No. 13, p. 431-32). In the area of activities of daily living, Dr. Eckelhoff noted Plaintiff's reported the ability to complete most without assistance, drive to the store without assistance, go to lunch with friends monthly, manage both her and her husband's medications, and handle financial matters. (*Id*., p. 432). Dr. Eckelhoff did not find that Plaintiff would have difficulties with communication or persistence. (*Id*.). Because Plaintiff would likely have difficulty with concentration, focus, and memory problems "at certain types of skilled jobs," Dr. Eckelhoff opined that Plaintiff would have some limitation in coping with work-like tasks and completing tasks within an acceptable timeframe. (*Id*., p. 433).

The ALJ considered Dr. Eckelhoff's findings and gave some weight to Dr. Eckelhoff's assessment. (*Id.*, p. 25). The ALJ noted Dr. Eckelhoff's finding that Plaintiff would likely have difficulty with concentration, focus, and memory at certain types of skilled jobs, and he also took

into account her opinion that Plaintiff would likely be effective in sustaining persistence and completing tasks. (*Id*.). The ALJ based his finding that Plaintiff was limited to light work, in part, on these findings. (*Id*.).

The ALJ also considered the limitations offered by non-examining state agency medical consultants, Jon Mourot, Ph.D. and Kay Gale, M.D., who found Plaintiff would be able to do semi-skilled work. (*Id*., pp. 25, 91, 108). However, the ALJ assigned their opinions only some weight and found Plaintiff was limited to essentially unskilled work based upon additional medical evidence submitted at the hearing level and the combined effects of her mental impairments and headaches. (*Id*., p. 25).

Plaintiff's assertion that the ALJ committed reversible error by not soliciting further opinion evidence from an examining physician is without merit. An ALJ is not required to procure an RFC assessment from treating or examining physicians, and the ALJ based his RFC assessment upon the opinions of examining and non-examining physicians, the medical evidence of record, and the Plaintiff's own reports. (*Id*., pp. 19-25).

Considering the evidence as a whole, the Court concludes the ALJ was not required to further develop the record because it was already reasonably complete and contained sufficient evidence from which the ALJ could make an informed decision. There is no ambiguity in the medical evidence of record that must be resolved.

### B.  Subjective Complaints

Plaintiff argues the ALJ improperly analyzed her activities of daily living. (ECF No. 16, p. 12). Plaintiff emphasized her reports that she: napped at least twice a day; experienced pain daily; had issues finishing what she started; and, she had difficulty leaving the house due to gastrointestinal symptoms. (*Id.*). Plaintiff further argues the ALJ's symptom analysis was based

solely on a perceived lack of objective evidence, arguing that the ALJ erroneously applied the rescinded SSR 96-7P. (*Id*., p. 13).

The ALJ is required to consider all the evidence relating to a claimant's subjective complaints, including: (1) daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and, (5) function restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). In so doing, the ALJ must also consider the claimant's prior work record, observations made by third parties, and the opinions of treating and examining physicians. *Id.*, 739 F.2d at 1322.

An ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them. *Id.* However, "[a]n ALJ . . . may disbelieve subjective reports because of inherent inconsistencies or other circumstances." *Wright v. Colvin*, 789 F.3d 847, 853 (8th Cir. 2015) (citing *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation and citation omitted)). The Eighth Circuit has observed, "[o]ur touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

In this case, the ALJ did not merely make a broad statement that Plaintiff's subjective symptoms were inconsistent with the record as a whole. (ECF No. 13, pp. 20-25). The ALJ's RFC determination does contain a recitation of the objective evidence, but it also contains specific consideration of her symptoms and which impairments could or could not be reasonably expected to produce her symptoms and the effect those symptoms would have on her residual functional capacity. (*Id*., pp. 23-25).

The ALJ considered Plaintiff's reports of back pain and noted that while she has been treated for lumbago with Tramadol as early as May 2014, there were no imaging studies of

record showing an abnormality, no evidence of anything other than conservative care being recommended, and no referral for a neurosurgical consultation. (*Id.*, p. 23).

Regarding Plaintiff's breast cancer, the ALJ found no evidence she experienced side effects of such severity during treatment that her treatment was interrupted or prolonged. (*Id.*). The ALJ found that while Plaintiff reported disabling post-therapeutic residuals, her reports were not consistent with objective medical findings, her treatment seeking behavior, or her reported physical abilities. (*Id.*). The ALJ noted that while Plaintiff had been diagnosed with peripheral neuropathy, EMG/NCS studies demonstrated no definite electrophysiological evidence of peripheral neuropathy, entrapment neuropathy or cervical/lumbosacral radiculopathy. (*Id.*). The ALJ referred to examinations by Dr. Knubley and Dr. Al-Khatib which both demonstrated diminished sensation in Plaintiff's lower extremities but were largely normal. (*Id.*, p. 24).

The ALJ considered Plaintiff's complaints of headaches, facial numbness/tingling, and tinnitus which were possibly related to chemotherapy, but which improved after sinus surgery, and the ALJ noted there was no evidence that Plaintiff sought additional treatment after August 2016. (*Id.*). The ALJ also considered the lack of evidence that Plaintiff ever sought hospital emergency treatment for an acute headache, and it was further noted that treatment providers felt Plaintiff's headaches were possibly related to a rebound effect from her prescribed pain medications, and she was instructed to decrease those medications. (*Id.*).

The ALJ considered Plaintiff's own reports of her daily activities, including preparing her own meals daily, light house cleaning, driving to the store and shopping for groceries, and providing care for her husband. (*Id.*).

The ALJ also considered Plaintiff's mental impairments, including her history of medication management, the lack of evidence that she sought ongoing professional mental health

treatment, and Dr. Eckelhoff's examination and opinions. (*Id*., pp. 24-25).

The undersigned concludes that the ALJ properly considered whether Plaintiff had a medically determinable impairment that could reasonably be expected to produce her reported symptoms and considered the degree to which her symptoms would limit her ability to function independently, appropriately, and effectively.

### C. RFC Determination

Plaintiff argues the ALJ erred by failing to give proper weight to the medical source statement provided by treating physician, Dr. Brandi Guthrey. (ECF No. 16, p. 13). Plaintiff highlights Dr. Guthrey's opinions that, due to neuropathy, Plaintiff could occasionally carry up to five pounds but never over six; that she could not use either hand for repetitive actions; that she would miss on average more than four days per month of work; would need a sit/stand/walk option; and, that side effects of her medications may impact her capacity for work. (*Id.*, p. 14).

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is defined as the individual's maximum remaining ability to do sustained work activity in an ordinary work setting "on a regular and continuing basis." 20 C.F.R. § 404.1545; Social Security Ruling (SSR) 96-8p. It is assessed using all relevant evidence in the record. *Id*. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be

supported by medical evidence that addresses the claimant's ability to function in the workplace. *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). Nevertheless, in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively. *Cox v. Astrue*, 495 F. 3d 614, 619 (8th Cir. 2007) (citing *Lauer v. Apfel*, 245 F.3d at 704); *Dykes v. Apfel*, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved only by medical evidence, we disagree."). Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012); 20 C.F.R. § 404.1546(c).

In this case, the ALJ considered the opinion of Dr. Guthrey, but afforded her opinions little weight. (ECF No. 13, p. 25). The ALJ found Dr. Guthrey's opinions were not consistent with objective findings in any of the medical evidence of record, including her own records, which would support such severe physical limitations or her opinion that Plaintiff would be likely to be absent from work for more than four days per month as a result of her impairments or treatment. (*Id.*). Moreover, Dr. Guthrey's medical source statement was not entitled to great weight as conclusory checkbox forms have been held to hold little evidentiary value. *See Anderson v. Astrue*, 696 F.3d 790 (8th Cir. 2012); *Wildman v. Astr*ue, 596 F.3d 959, 964 (8th Cir. 2010); *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (checklist format, generality, and incompleteness of the treating physician's assessments limited their evidentiary value).

As discussed above, the ALJ considered each of Plaintiff's subjective complaints and examined the medical records thoroughly. (ECF No. 13, pp. 19-25). The ALJ also considered the opinions of medical consultant, Dr. Al-Khatib, and gave some weight to his assessment of

Plaintiff's handling and fingering limitations, but little weight to his assessment of her ability to stand and walk as there were no objective findings to support those limitations. (*Id.*, p. 25).

In making his RFC determination the ALJ considered Plaintiff's testimony and other reports of her symptoms, treatment records, and medical opinions from a treating physician, two non-examining medical consultants, and two consultative examiners. (*Id.*, pp. 19-25).

The ALJ's RFC determination is supported by the medical and other evidence of record. The lack of RFC assessments from Plaintiff's treating physicians does not render the ALJ's RFC determination invalid. The ALJ's RFC determination is supported by substantial evidence.

### V. Conclusion

For the reasons and upon the authorities discussed above, it is recommended that the ALJ's decision be affirmed and the Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 14th day of June 2019.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE